

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-13-00141-CR

_____

JASON HOSEY, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 5th District Court
Bowie County, Texas
Trial Court No. 11 F 0798 005

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Justice Moseley

# M E M O R A N D U M   O P I N I O N

Although a Bowie County jury acquitted Jason Hosey of a charge of sexual assault, it convicted him of two counts of indecency with a child by contact, for which he was sentenced to serve ten years' incarceration on each count. *See* TEX. PENAL CODE ANN. § 21.11(a)(1) (West 2011).[1] Hosey appeals his conviction, alleging four points of error. He claims (1) that the evidence was insufficient to support his conviction, (2) that the court erred in admitting certain evidence of Hosey's physical abuse of the complainant, (3) that the court committed error when it refused to allow evidence that the complainant had previously recanted the allegations she pressed against Hosey, and (4) that error was committed in allowing the introduction of evidence concerning extraneous offenses. We overrule Hosey's points of error and affirm the trial court's judgments and sentences.

Hosey's daughter, Betty,[2] testified Hosey frequently, over a period of several months, compelled Betty to give Hosey "massages," which included forcing Betty to touch Hosey's testicles. These massages first commenced when Betty was fifteen years old. On occasion, Hosey would massage Betty, and on at least one occasion during one of these massages, Hosey fondled Betty's breasts. During another such massage, Hosey rubbed her clitoris. Betty also testified that Hosey regularly called her insulting, belittling names, including "whore," "nigger

---

[1]These sentences were to be served concurrently.

[2]The name "Betty" is a pseudonym. The complainant was fifteen years old when the abuse occurred, and the investigation and information identified her with a pseudonym. By the time of trial, Betty was eighteen and testified using her real name. Both parties use her real name in their briefing. She was, however, younger than seventeen at the time of the abuse, as was the witness who testified to extraneous offenses in the State's rebuttal case. In an abundance of caution and giving a broad reading to Article 57.02 of the Texas Code of Criminal Procedure, we use pseudonyms for these two witnesses. *See* TEX. CODE CRIM. PROC. ANN. art. 57.02 (West Supp. 2013).

loving whore," "bitch," and "trash." At least some of this opprobrium sprang from Hosey's discovery that Betty had been dating a young black man; upon learning this, Hosey removed Betty from the school she was attending and transferred her to another.

Betty also described an event occurring on the first day of one school year. On that occasion, she was confronted by Hosey when she returned home. Hosey told her that a teacher had complained about Betty's behavior and punished her by beating her with a belt. The day following this, Betty reported this beating to the school nurse, who photographed the resulting injuries.

## I.    Sufficiency of the Evidence

Hosey's first point of error argues there was no evidence that he had touched Betty's breasts with the intent to arouse or gratify his sexual desire.[3] Based on our review of the record, we disagree with Hosey's interpretation of the evidence.

In evaluating the legal sufficiency of the evidence, we review all the evidence in the light most favorable to the trial court's judgment in order to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd). We examine legal sufficiency under the direction of *Brooks*, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable

---

[3]While the statute penalizes contact with intent to arouse or gratify the sexual desire of any person, the information charged Hosey had engaged in the contact with intent to arouse his sexual desire. *See Byrd v. State*, 336 S.W.3d 242, 252–53 (Tex. Crim. App. 2011)

inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19).

Sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id*.

Under the hypothetically correct jury charge for count two, the State was required to prove that Hosey, with the intent to arouse or gratify his sexual desire, intentionally or knowingly engaged in sexual contact with Betty by touching her breasts. *See* TEX. PENAL CODE ANN. § 21.11(a)(1), (c) (West 2011).

Intent and knowledge are fact questions for the jury and are almost always proven through circumstantial evidence. *See Robles v. State*, 664 S.W.2d 91, 94 (Tex. Crim. App. 1984). Jurors may infer intent from the defendant's acts, words, and conduct. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004).

> Rarely will there be direct evidence of what an accused intended at the time of the incident. Thus, the fact-finder usually must infer intent from circumstantial evidence rather than direct proof. More specifically, in the context of indecency with a child, the fact-finder can infer the requisite intent to arouse or gratify sexual desire from conduct, remarks, or all the surrounding circumstances. The intent to arouse or gratify may be inferred from conduct alone. No oral expression of intent or visible evidence of sexual arousal is necessary.

*Scott v. State*, 202 S.W.3d 405, 408 (Tex. App.—Texarkana 2006, pet. ref'd) (citations omitted).

4

Betty testified that Hosey frequently required her to give him massages. On occasion, he would massage her, first rubbing her shoulders. On these occasions, "[e]ventually, he'd say, 'Now take your shirt off. I can't reach, I can't do it good enough. Take your shirt off so I can get you -- get it done good -- so I can do a good job.'" She would comply by removing her shirt, after which "[h]e would rub my boobs[4] with the lotion that I had used to rub him. . . . [H]e was always touching my butt and my thighs, my boobs." Hosey claims that this is the only evidence supporting his conviction of count two of the charges against him (indecency by contact by engaging in sexual contact with Betty's breasts). Hosey then urges us to find that there is no evidence he did this with the intent to arouse or gratify his sexual desire.

Betty testified to several instances of Hosey's conduct from which a rational juror could infer that Hosey had touched Betty's breasts with the intent to arouse or gratify his sexual desire. Hosey frequently made comments about Betty's "fine ass"; Hosey and his girlfriend openly discussed sexual positions they intended to try in the presence of Betty and her younger brother. On one occasion, one of Betty's siblings "pantsed" her, or pulled a prank by pulling her pants and underwear down. Hosey observed this and referred to Betty's pubic or vaginal area. According to Betty, he said, "You need to start shaving that. The boys aren't going to like it." Betty continued, "And he later asked me if he could shave it." After Betty introduced Hosey to a young man, Seth (in whom Betty was interested), Betty kissed Hosey when they were alone,

---

[4]Children's use of nonanatomical terms in describing sexual offense has long been accepted in reviewing the sufficiency of the evidence. *See Villalon v. State*, 791 S.W.2d 130, 134 (Tex. Crim. App. 1990) (citing *Luna v. State*, 515 S.W.2d 271 (Tex. Crim. App. 1974); *Nilsson v. State*, 477 S.W.2d 592 (Tex. Crim. App. 1972)); *Jones v. State*, 817 S.W.2d 854, 856 (Tex. App.—Houston [1st Dist.] 1991, no pet); *Guia v. State*, 723 S.W.2d 763, 766 (Tex. App.—Dallas 1986, pet. ref'd); *Bellfey v. State*, 638 S.W.2d 48, 50–51 (Tex. App.—Houston [1st Dist.] 1982, no pet.). Hosey makes no complaint about the terms Betty used to describe his actions.

"like a daughter kisses her daddy." Hosey told her he did not "think Seth [was] going to like those kisses," insinuating she should kiss Hosey on his lips with her eyes closed, which Betty did. Hosey dared Betty to run through the house nude, and when she did, he made motions with his hands as if he were snapping photographs. When Hosey found Betty and her stepsister eating from a jar of pickles, he made the stepsister put the jar between her legs and Betty bite a pickle, "[i]n a sexually suggestive way." On another occasion while he was standing in the doorway of the bathroom in his underwear, Hosey called to Betty; when she looked at him, he pulled down his underwear to expose his penis and laughed.

Once, Hosey tickled Betty, then moved to kiss her stomach and the area between her hips and pubic area. When she was fifteen, Betty said Hosey began asking her to massage him with lotion;[5] he wore only his underwear and guided her hands to the area between his hips and pubic area, telling Betty, "'That feels good.'" These massages were common, and the room was always dark. Betty said her hands would be under Hosey's underwear, "massing [sic] his, his balls. And then he starts thrusting his crotch. I told him my hands were cramping up, and he said, 'Well, it's only -- just do it for a few more minutes, just a few more minutes.'" At least one time during these massages, Betty said she touched Hosey's penis, which led him to "jerk[] it back towards [Betty] and he said, [']It's not going to bite you.[']" When Hosey finally told her to stop, Betty did not know whether he ejaculated, but he told her, "'Now, get out, bitch, so I can change.'" He would always change his underwear on these occasions. Once Hosey told Betty

---

[5]All of these massages involved Betty applying lotion to Hosey. Hosey required the massages from Betty and her stepsister, but never from her brother. The massages would happen as often as two or three times a day and then might cease for two or three weeks. Betty said they took place over a period of several months, starting when she was fifteen.

he had "shaved his nuts" for her. Another time, Hosey announced that if Betty was "going to be a whore, [she was] going to know how to do it the right way,"[6] and he made her remove his shirt and pants. Betty described a massage session where Hosey administered the massage, and he rubbed Betty's clitoris. He finally stopped when, as Betty described it, her "body was reacting the way that it should." Betty went to the bathroom and cried. Afterwards, Hosey hugged her and told her she "didn't have to do that again if [she] didn't want to." The massages continued, but Hosey never touched her sexual organ again.

From all of this evidence, a rational jury could find beyond a reasonable doubt that Hosey touched Betty's breasts with the intent to arouse or gratify his sexual desire. We overrule the first point of error.

## II.     Hearsay Claim Not Preserved

In his second point of error, Hosey complains that the testimony from the school nurse that Betty had told her about Hosey beating her with a belt (together with photographs that were taken by the nurse of the physical evidence of the damage to Betty's body) amounted to inadmissible hearsay testimony which should have been excluded. The State first offered the nurse's testimony as rebuttal to Hosey's defensive theory, pointing out that in opening argument, Hosey had told the jury that Betty fabricated her allegations of sexual abuse because the Hosey home was too strict, which allowed her to be removed from the family home and to live with a friend's family. When the State told the trial court it wanted to introduce testimony from the school nurse that Betty told the nurse Hosey had beaten her with a belt, the State said this

---

[6]Hosey had been calling Betty a whore since she dated a young black man and he made her change schools.

evidence was admissible to rebut Hosey's insinuation that Betty fabricated her allegations. Alternatively, the State argued the evidence was admissible under the rubric of Article 38.37 of the Texas Code of Criminal Procedure, which authorizes, in specific situations, admission of evidence of other crimes, wrongs, or acts committed by the defendant against the child victim of certain sexual offenses. *See* TEX. CODE CRIM. PROC. ANN. art. 38.37 (West Supp. 2013). The trial court admitted the nurse's testimony, including descriptions and photographs of bruising on Betty's thigh and buttocks, specifically citing Article 38.37 as authority.

Hosey objected that evidence of physical abuse was not relevant to the pending charges of sexual abuse. The trial court allowed a running objection to the testimony, but at no time did Hosey raise any hearsay objection to any part of the nurse's testimony. An appellant's point of error must be the same issue raised by motion or objection asserted at trial. TEX. R. APP. P. 33.1(a); *Ibarra v. State*, 11 S.W.3d 189, 197 (Tex. Crim. App. 1999) (nothing preserved for review if issue on appeal does not comport with objection at trial). Hosey's appellate complaint of hearsay was not presented to the trial court. Because it was not raised at trial, this issue is not preserved for our review.[7] The second point of error is overruled.

## III. No Evidence Complainant Recanted

Hosey argues in his third point of error that the trial court erred in preventing Hosey from introducing evidence that Betty had recanted her allegations she made about physical abuse

---

[7]Even if Hosey had made a hearsay objection, the nurse said the information from Betty about Hosey inflicting the injuries in the course of the nurse's job description was pertinent to the nurse's diagnosis and treatment of Betty's injuries. Although we reach no decision on this matter, it is very likely Betty's statements were admissible under the medical diagnosis or treatment exception of the hearsay rule. *See* TEX. R. EVID. 803(4); *Taylor v State*, 268 S.W.3d 571, 589–91 (Tex. Crim. App. 2008); *Beheler v. State*, 3 S.W.3d 182, 188–89 (Tex. App.—Fort Worth 1999, pet. ref'd).

inflicted on her by Hosey. This recantation, Hosey argues, would establish that the allegation of physical abuse was false, and thus be effective to impeach Betty's credibility regarding the charged offenses. As part of its case-in-chief, the State presented evidence that on at least one occasion, Hosey had whipped Betty with a belt, and the next day Betty reported this abuse to her school nurse and school counselor. During cross-examination of Betty, Hosey sought to introduce evidence that Betty had recanted allegations of a different claim of physical abuse she made against him.[8] The trial court refused to allow Hosey to bring up evidence of this purported recantation.

We review the trial court's decision to admit or exclude evidence under an abuse-of-discretion standard. Under that standard of review, we will not disturb the trial court's ruling if it lies within the "zone of reasonable disagreement." *Cameron v. State*, 241 S.W.3d 15, 19 (Tex. Crim. App. 2007). Where a defendant attempts to introduce evidence that a complainant has made a prior false accusation and seeks to introduce evidence of this alleged false accusation, the Texas Court of Criminal Appeals has found a case-by-case analysis appropriate. *Lopez v. State*, 18 S.W.3d 220, 225 (Tex. Crim. App. 2000).

Lopez was charged with forcing a young boy to perform oral sex on him. Lopez sought to introduce evidence that two years before the alleged offense, the boy had falsely accused his mother of throwing him against a washing machine. *Id.* at 226. Although Lopez had a "heightened need" to impeach the complainant's testimony, the proffered evidence would not

---

[8]The record seems to indicate that Hosey was making reference here to an incident where Betty claimed that when Hosey found out Betty had been dating a black boy, he had choked and slapped her, leaving bruises. It is this alleged incident of choking Betty that Hosey claimed that Betty had subsequently recanted.

9

have served that goal.  *Id.* at 225.  First, there was nothing to show that the complainant had falsely accused his mother of abuse.  More importantly, an allegation of physical abuse of the complainant by his mother had "almost nothing in common" with the complainant's accusation that Lopez forced the boy to perform oral sex.  *Id.* at 226.  The Texas Court of Criminal Appeals found no probative value in impeaching the child complainant's credibility, and the court found a high risk that the evidence would "unduly prejudice and confuse the jury."  *Id.*  The trial court did not err in excluding testimony concerning the washing machine incident.[9]  The Texas Court of Criminal Appeals found Lopez' proffered evidence was inadmissible, both because there was no showing that the prior accusation was false and because of its dissimilarity to the offense with which Lopez was charged.  *Id.* at 226.

Here, there was no showing that the allegation of physical abuse was false, much less that it was recanted.  As an offer of proof, Hosey told the trial court that he could present two witnesses, Deja James (daughter of Hosey's one-time girlfriend) and Dana Garrison, whom Hosey said would testify that they were present when Betty recanted to a Child Protective Services (CPS) employee her allegation of Hosey's physical abuse.  The State countered by producing an excerpt from a CPS report which, judging from the context of the argument between the parties, seems to refer to the same incident Hosey referenced.  That report excerpt relates that Betty told the interviewer that after Hosey learned that Betty had been seeing a black

---

[9]Conversely, in *Billodeau v. State*, 277 S.W.3d 34, 37–38 (Tex. Crim. App. 2009), the trial court did err in excluding evidence that the child complainant threatened to accuse witnesses of molesting him when he got angry at them.  *See also Hammer v. State*, 311 S.W.3d 20, 22 (Tex. App.—San Antonio 2010, no pet.) (where defense not allowed to cross-examine complainant regarding claims she had previously made false accusations against other persons to cover up complainant's own sexual encounters with boyfriend; and that she had accused multiple other persons of molesting her).  This inability to fully present his defense affected Hammer's substantial rights and was harmful error.

10

boy, Hosey "slapped her on her face and there was a bruise on her face and neck from also being choked." Later in the report, apparently referring to the same incident, Betty said she was in her bed, pretending to be asleep, and Hosey grabbed her by the throat. The report went on to say that Betty "wasn't answering him because she just couldn't really talk because he had his hand on her throat and he kind of pulled her up using his hand around her neck. She states that she had some bruises and when she told her friends about it, her friends swore that they could see some bruising." Later, "[a]t the end of the conversation she began to downplay the situation that took place stating that he did only put his hand around her neck and kind of squeezed and lifted her off the bed with it."

Nothing before the trial court affirmatively established that Betty recanted her allegation of Hosey choking her, and there is no evidence suggesting that her claim regarding that incident of physical abuse was false. Further, this alleged physical abuse, which appears to have occurred sometime before the alleged sexual abuse started, is not similar to the conduct for which Hosey stood trial.

Due to the dissimilarity of the two instances, evidence of the alleged recantation by Betty which Hosey attempted to pursue could be deemed a collateral matter. As a general rule, the use of a collateral matter in an effort to impeach is impermissible. *Pierson v. State*, 426 S.W.3d 763, 772 (Tex. Crim. App. 2014); *see* TEX. R. EVID. 608(b). As the proponent of this evidence, it was Hosey's burden to show some exception to this general rule. *See* TEX. R. EVID. 104(a). Hosey failed to meet this burden.

11

This case is very similar to the situation in *Lopez*, and we cannot say the trial court abused its discretion in excluding the evidence concerning Betty's alleged recantation.[10] We overrule this point of error.[11]

## IV. Extraneous-Offense Testimony to Rebut Defensive Theory

After Hosey rested his case-in-chief, the State put on rebuttal witnesses, including Betty's half-sister, Chloe,[12] who testified to sexual abuse Hosey had inflicted upon her. Hosey argues that the trial court erred in admitting this evidence of extraneous bad acts. Extraneous offenses or bad acts are not admissible to prove the defendant acted in conformity with his criminal nature. TEX. R. EVID. 404(b); *Abdnor v. State*, 871 S.W.2d 726, 738 (Tex. Crim. App. 1994).

---

[10]In making its ruling, the trial court carefully discussed *Lopez* and other caselaw, clearly acting with "reference to . . . guiding rules or principles" and, hence, did not abuse its discretion. *See Randon v. State*, 107 S.W.3d 646, 648 (Tex. App.—Texarkana 2003, no pet.) (citing *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g)).

[11]Although Hosey states in his brief that the State admitted "twice on the record that the victim did in fact recant[ ] the allegation to a judge in chambers during a Child Protective Services case," that does not appear to be accurate. The State advised the trial court as follows:

> [L]ater on during a custody issue that arose out of this case between Mr. Hosey and the mother, which is who she initially reported the physical abuse to, that he had instructed her to go into the judge's chambers and tell her and her brother that everything was great and that there were [sic] no physical or verbal abuse going on at the home, they did not want to go live with their mother, and they did as they were instructed.
>
> . . . .
>
> . . . But as far as the allegation of physical abuse, the victim still maintains that it did occur.
>
> . . . .
>
> . . . She has explained to me that she was instructed to tell the judge that it did not happen, but she maintains that it in fact did happen. She never recanted in regards to the CPS case.

This exchange between the State and trial court does not change our application of *Lopez*.

[12]A pseudonym; see footnote two.

The State responds that the sister's testimony was admissible to rebut Hosey's defensive theory that Betty fabricated her allegations.

A defendant's opening statement may open the door to the admission of extraneous-offense evidence to rebut defensive theories presented in that opening statement. *Bass v. State*, 270 S.W.3d 557, 563 (Tex. Crim. App. 2008). Bass was a pastor accused of sexually assaulting a teenager on church property. In his opening statement, Bass claimed the teenager's allegations were "pure fantasy" and "pure fabrication." He claimed as part of his opening statement that "as a pastor and minister," he was "the real deal and the genuine article." *Id.* at 558. After the teenager testified, the trial court permitted the State to present extraneous-offense evidence during its case-in-chief, which showed that appellant had sexually assaulted two other girls (ages five and eleven) in his church office. Bass also presented evidence impugning the character of the complainant as a truthful person, and the defendant testified, denying the charged and extraneous offenses. The Court of Criminal Appeals found admission of the extraneous conduct to be within the zone of reasonable disagreement and that it did not constitute an abuse of discretion by the trial court. "It is subject to reasonable disagreement whether this extraneous-offense evidence made these defensive theories less probable." *Id.* at 563.

In *De La Paz v. State*, 279 S.W.3d 336, 345 (Tex. Crim. App. 2009), the defendant[13] claimed in opening argument, then through cross-examination, and again in his own testimony that the State's two main witnesses were lying. While taking note that De La Paz's attack on the State's witnesses "was not as strong, direct, or sustained as Bass's was on his teenage

---

[13]De La Paz was a former police officer who was charged with and convicted of tampering with a witness and aggravated perjury.

13

complainant," the Court of Criminal Appeals pointed out that De La Paz suggested in his opening remarks that the State's witnesses "would say whatever the State wanted to hear" and in his direct testimony "inferentially accuse[d]" the witnesses of lying. *Id.* at 346. The decision to admit evidence of De La Paz's involvement in other suspicious illegal drug deals to which those witnesses made reference was at least within the zone of reasonable disagreement. *Id.* at 346–47.[14]

In Hosey's opening argument, he said that the evidence would show he was a very strict parent, which Betty did not like. He said there would be evidence that a teacher called him to report poor behavior on Betty's part and that he grounded Betty as punishment. The next day (according to Hosey's opening argument to the jury) Betty "starts telling people at the school what she now claims he did." CPS then got involved, and Betty did not return to the family home. Instead, Betty was able to live with the family of a friend. Thus, according to Hosey, Betty "had something to gain by this," and the jury could "judge the credibility of her testimony." When he took the stand, Hosey denied all of Betty's allegations, including her descriptions of Hosey's improper behavior, sexual comments, insults, and physical abuse.[15] He did, however, say that

> [t]he only massage I ever got from any of my children or anyone else in the
> house, I would have them take their hands and beat on my back, right in the

---

[14]After reaching this conclusion, the Court of Criminal Appeals went on to find the extraneous acts were admissible under the doctrine of chances. *De La Paz*, 279 S.W.3d at 347–48.

[15]On cross-examination, Hosey agreed with the State that his defensive theory was that Betty fabricated all of her allegations. "As a general rule, the defensive theory that the State wishes to rebut through the use of extraneous offense evidence must be elicited on direct examination by the defense and may not be elicited by 'prompting or maneuvering' by the State." *Wheeler v. State*, 67 S.W.3d 879, 885 (Tex. Crim. App. 2002).

middle of it. Beat on it hard as they can, to try to loosen the muscles up and stuff in my back. Anything else as far as lotion, no. Absolutely not. I don't like lotion.

Hosey's defensive theory, as raised in his opening argument, during his direct examination, and to a lesser extent, in cross-examining the State's witnesses, could be found to have opened the door to extraneous offenses, assuming the extraneous acts were sufficiently similar to a charged offense.[16] *See Wheeler*, 67 S.W.3d at 887 n.22.

Chloe, eighteen years old at the time of trial, testified that Hosey was her step-father. She testified to three occasions, on which Hosey touched her inappropriately when she was ten years old. All three occasions, according to Chloe, occurred on the couch at the family home. Based on Choloe's testimony, Hosey put his hands inside her pants "in the crease in between [her] legs, but he never stuck his hands in [her] hole." She did answer "yes" when asked if Hosey touched her "vaginal area." She went on to state that during this touching, Hosey "would just rug [sic] his fingers around." Another time, also on the couch, the sister testified that she and Hosey were lying together in a "spooning" position when Hosey put his hands in her panties. On a third occasion, as the two lay on the couch extended out into a bed (again in a spooning position), Chloe testified that Hosey was touching her, but she did not specify how or where she was touched. Chloe also described a time when Hosey wanted her to "rub his belly, which is usually normal. . . . [I]f he'd ask us to scratch his back . . . we would, or give him a massage on the shoulders, we would." Chloe testified that on this occasion, she was rubbing Hosey's belly,

---

[16]However, extraneous-offense evidence offered to rebut a defensive theory of fabrication does not need to have the same degree of similarity as required to show identity, system, or modus operandi. *See Dennis v. State,* 178 S.W.3d 172, 179 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd).

"[h]e tells me to go lower and lower," which she did until she grew uncomfortable. According to Chloe, Hosey tried to make her hand go "lower . . . . [t]o where his pants were, but [she] never went past his pants." Chloe said that she never touched Hosey's penis or genitalia.

Hosey's defense at trial was that Betty fabricated her allegations of sexual abuse. In support of that position, Hosey presented witnesses who testified that Betty was a liar and an untruthful person, and Hosey testified, denying all of the allegations made by her. In ruling Chloe's testimony admissible, the trial court discussed *Newton v. State*, 301 S.W.3d 315 (Tex. App.—Waco 2009, pet. ref'd), where the reviewing court found extraneous-offense evidence of another sexual assault committed under similar circumstances as the charged offense admissible to rebut a defensive theory of fabrication. *Id.* at 318. The trial court here stated that the proffered testimony from Chloe was similar to the offense described by Betty and was offered to rebut Hosey's defensive theory of fabrication. The trial court also conducted an analysis under Rule 403 of the Texas Rules of Evidence, which we discuss below. We agree with the trial court that there were similarities between Hosey's conduct described by both Betty and Chloe. Both victims lived in Hosey's home as daughters (Betty is the biological child of Hosey; Chloe's mother was married to Hosey, and Chloe referred to Hosey as her "Daddy"). Both girls described inappropriate touching in their vaginal areas, which began with or evolved from some form of massaging of Hosey. It is also true that there are differences between the two instances. Chloe described abuse which occurred when the children were of different ages (when Chloe was about ten years old and when Betty was about fifteen). The girls said the abuse occurred in different rooms, and Betty described touching of her breasts whereas Chloe did not. However,

16

these differences do not render the offenses so dissimilar as to preclude the trial court from finding them similar enough for purposes of rebutting Hosey's defensive theory.

In light of *Bass* and *De La Paz*, and the trial court's reliance on *Newton*, it cannot be said that the trial court acted without regard to guiding principles of law. In the words of the Court of Criminal Appeals, "[I]t is at least subject to reasonable disagreement whether the extraneous-offense was admissible for the noncharacter-conformity purposes of rebutting appellant's defensive theory that the complainant fabricated her allegations against him . . . ." *Bass*, 270 S.W.3d at 563. We find the testimony of Chloe regarding extraneous offenses was admissible under Rule 404(b) of the Texas Rules of Evidence; we overrule Hosey's fourth point of error.

## V.     Rule 403 Analysis

Even if Chloe's extraneous-offense testimony was admissible under Rule 404(b), Hosey argues that the prejudicial effect of the testimony substantially outweighed any probative value and that as a consequence, it should not have been admitted. *See* TEX. R. EVID. 403. The trial court discussed considerations relevant to the Rule 403 weighing analysis and found that the danger of unfair prejudice did not substantially outweigh the probative value of Chloe's testimony. After weighing the probative value of the testimony against its prejudicial effect, the trial court allowed its admission.

In determining whether extraneous-offense evidence that is admissible to rebut a defensive theory, should nonetheless be excluded under Rule 403, a trial court must balance the following considerations:

1.     The inherent probative force of the proffered evidence, along with
2.     The propopent's need for the evidence of the extraneous offense, versus

17

3.    Any tendency the evidence may have to suggest a decision by the jury on an improper basis;
4.    Any tendency the evidence could have to confuse or distract the jury from the main issues;
5.    Any tendency the evidence could have to be given undue weight by a jury which has not been equipped to evaluate the probative force of the evidence; and
6.    The likelihood presentation of the proffered extraneous evidence could consume an inordinate amount of time to present, or simply repeat evidence which has already been presented.

*See Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006).  The trial court here engaged in a lengthy on-the-record analysis of these factors.

The trial court found Chloe's proffered testimony inherently probative, and we agree: evidence Hosey engaged in inappropriate sexual contact with another female child in his care in his home in a father and daughter kind of relationship makes a fact of consequence for the trial at bar more probable.  Like the trial court, we find that the State (the proponent of the extraneous-offense evidence) needed this evidence; otherwise, the trial was something of a "he said/she said" swearing contest.[17]  The trial court opined that it found little to no chance that the jury could be swayed by Chloe's testimony to reach a decision on an improper basis or that such testimony would confuse or distract the jury from the main issue or give the evidence undue weight.  The trial court stated,

> The jury is capable of making its own determination about the veracity of the complaining witness in this case without being improperly led astray by the nature of this testimony. . . . The main issue before the jury is whether or not the

---

[17]*Cf. Hammer v. State*, 296 S.W.3d 555, 561–62 (Tex. Crim. App. 2009)

> Sexual assault cases are frequently "he said, she said" trials in which the jury must reach a unanimous verdict based solely upon two diametrically different versions of an event, unaided by any physical, scientific, or other corroborative evidence.  Thus, the Rules of Evidence, especially Rule 403, should be used sparingly to exclude relevant, otherwise admissible evidence that might bear upon the credibility of either the defendant or complainant in such "he said, she said" cases.

defendant committed the offenses that the complaining witness testified to. I don't see the evidence admitted here will confuse them from that issue.

We agree with the trial court's assessment. Chloe's testimony was offered in rebuttal, after both sides had rested their respective cases. Her testimony was not likely to confuse the jury. While the testimony, if believed, would likely have negatively colored the jury's view of Hosey, it was not so graphic as to be worse than the specifics to which Betty had already testified. We also find that it was unlikely the jury would have put undue weight on Chloe's testimony. The trial court instructed the jury that they were to consider the rebuttal testimony only for rebuttal, and only if they concluded beyond a reasonable doubt that Hosey, in fact, committed the alleged offenses against Chloe. Further, Chloe's testimony did not take an inordinate amount of time to present (about thirty-three pages of testimony in two volumes of trial record). We find the trial court was within its discretion in concluding that the Rule 403 factors weighed in favor of admitting the rebuttal testimony.

We affirm the trial court's judgment.


Bailey C. Moseley
Justice


Date Submitted:     June 18, 2014
Date Decided:       July 23, 2014

Do Not Publish

19